UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CALINDA LEJEUNE<br>    -  Plaintiff<br>v.<br><br>L'OREAL USA, Inc.; L'OREAL USA<br>PRODUCTS, INC.; STRENGTH OF NATURE<br>GLOBAL, LLC; SOFT SHEEN - CARSON, INC;<br>SOFT SHEEN CARSON (W.I.), INC., GODREJ<br>SON HOLDINGS, INC.; DABUR<br>INTERNATIONAL, LTD.; DABUR USA, INC.;<br>And NAMASTE LABORATORIES, LLC.<br>    -  Defendants | CIVIL ACTION NO: _____<br><br><br><br><br><br>JURY REQUESTED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff, Calinda LeJeune ("Plaintiff"), through undersigned counsel, makes the following Complaint against Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc. ("L'Oréal"), Soft Sheen-Carson LLC, ("Soft Sheen"), Soft-Sheen Carson (W.I.), Inc., Godrej Son Holdings, Inc. Dabur USA, Ltd. ("Dabur USA"), Dabur International, Ltd. ("Dabur International") and Namaste Laboratories, LLC ("Namaste")(collectively, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.    This action arises out of Calinda LeJeune's diagnosis of ovarian cancer. Ms. LeJeune's ovarian cancer was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair care products, specifically hair straightening and/or relaxing products.

2.     Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as chemical hair straighteners, including but not limited to Dark & Lovely and ORS Olive Oil (together, the "Products").

## I.     PARTIES

3.     Plaintiff is and, at all times relevant to this action was, a citizen and resident of the State of Louisiana with her place of residence being Baton Rouge, West Baton Rouge Parish, State of Louisiana.

4.     Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York 10017 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

5.     Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 10 Hudson Yards 347 10th Avenue New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

6.     Defendant Soft Sheen Carson, LLC, is, and at all times relevant to this action was, a limited liability company with its principal place of business and headquarters located at 80 State St., Albany, New York 12207 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207. Upon information and belief, Plaintiff alleges in good faith, at all times relevant to this action, Soft Sheen-Carson, LLC's members and

sole interested parties are L'Oréal S.A., a corporation having its headquarters and principal place of business in France; and L'Oréal USA, Inc., a corporation with its principal place of business and headquarters at 575 Fifth Avenue, New York, New York 10017.

7.    Defendant Godrej Son Holdings, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

8.    Namaste Laboratories, LLC is, and at all times relevant to this action was, a limited liability company with its principal place of business and headquarters located at 310 S. Racine, 8th Floor, South, Chicago, Illinois, 60607.  Upon information and belief, Plaintiff alleges in good faith, at all times relevant to this action, Namaste Laboratories, LLC's member and sole interested party is Dabur India, Ltd., a foreign company with its principal place of business in the United States at 120 Broadway, 32nd Floor, New York, New York, 10271.

9.    Dabur USA, Ltd. is, and at all times relevant to this action was, a foreign company with its principal place of business in the United States at 120 Broadway, 32nd Floor, New York, New York, 10271.

10.    Dabur International, Ltd. is, and at all times relevant to this action was, a foreign company with its principal place of business in the United States at 120 Broadway, 32nd Floor, New York, New York, 10271.

11.    At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Illinois.

12.    At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products, including but not limited to:

      a.      Dark & Lovely;

      b.      Just for Me.

      c.      Motions

      d.      ORS Olive Oil

      e.      Optimum Care

13.    Defendants' defective hair product was placed into the stream of interstate commerce and was used by the Plaintiff from 1986 through 2022.

14.    In 2022, Plaintiff was diagnosed with ovarian cancer, a diagnosis caused by Plaintiff's exposure to chemicals in the Defendants' hair care products.

15.    Plaintiff did not learn of the causative connection between the use of the Products and her ovarian cancer until the December of 2022.

**II.    JURISDICTION AND VENUE**

16.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

17.    Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in the State of Louisiana through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

18.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of Louisiana as

Defendants expected that the Products, which they placed into the stream of commerce, would be purchased by consumers in the State of Louisiana.

19.   This Court has personal jurisdiction over Defendants because they conduct business in Louisiana, purposefully direct and/or directed their actions toward Louisiana, consented to being sued in Louisiana by registering an agent for service of process in Louisiana, and/or consensually submitted to the jurisdiction of Louisiana when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Louisiana necessary to constitutionally permit this Court to exercise jurisdiction. Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the State of Louisiana, the damages were sustained by Plaintiffs within the State of Louisiana, and the damages sustained by Plaintiffs were a result of Defendants' actions and/or inactions—described herein—that were purposefully directed at and/or within the State of Louisiana.

20.   Venue in this District is proper under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiffs reside in this District.

21.    Venue is proper in this district pursuant to 28 U.S.C. §§1391(a) and (b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants are subject to this Court's personal jurisdiction.

## III.   FACTS COMMON TO ALL COUNTS

### A.   Hair Straighteners and Relaxers

#### a.   Market for Hair Straightening and Relaxing Products

22.   Black people make up about 13 percent of the U.S. population, but by one estimate, African-American spending accounts for as much as 22 percent of the $42 billion-a-year personal

care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients– than Americans as a whole. [1]

23.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less hazardous alternatives to personal care products. The worst-scoring products marketed to Black women were hair relaxers, and hair colors and bleaching products. Each of these categories had an average product score indicating high potential hazard.

24.     In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

25.     In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

### b.     History of Hair Relaxers in America

26.     In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patters; as well as its density, fullness, texture, and feel.[2]

27.     Afro-textured hair "naturally grows up and out." [3]

---

[1] *Thandisizwe Chimurenga*, How Toxic is Black Hair Care?, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; Personal Care Products Manufacturing Industry Profile, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

[2] *Patrick Obukowcho*, Hair Relaxers: Science, Design, and Application, 26, 14 (2018).
[3] *Ayana Byrd & Lori Tharps*, When Black Hair Is Against the Rules, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

28.     In Africa, hair was seen as a source of personal and spiritual power. As the highest point of the body and "most elevated part of the body, some communities believe[d] [their hair] connected them with the divine."[4] For some, hair was the "conduit for spiritual interaction with God."[5]

29.     African hairstyles were also status symbols reflecting one's "marital status, age, religion, and rank in society" and one's tribe.[6]  Warriors, kings, and queens wore braids to show their ranking in society.[7] The Wolof tribe in West Africa, wore braided styles when they went to war.[8]

30.     Most styling was extremely intricate and involved days of labor. Everyone though engaged in this process as "only the mad and mourning did not do their hair."[9]

31.     One of the first things slave masters did to enslaved people forced to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[10] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

32.     The very nature of slavery involved working long hours in dire conditions. Enslaved people had "no time to care about one's appearance or one's hair."[11] "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangles tresses and

---

[4] *Nikki Fox*, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.

[5] *Rumeana Jahangir*, How Does Black Hair Reflect Black History?, BBC News. May 31, 2015. https://www.bbc.com/news/uk-england-merseyside-31438273.amp

[6] History of Braids: More Than Just a Hairstyle, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.

[7] *Id*.

[8] *Id*.

[9] *Hlonipha Mokoena*, From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair, Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hairmyths-from-slavery-to-colonialism-school-rules-and-good-hair/.

[10] *Brenda A. Randle*, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114– 121 (2015).

[11] Nikki Fox, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021.

shield them from hours spent toiling under the sun."[12]  The hair that was once an important spiritual and cultural symbol became tangled and matted.

33.    White Americans did not see African or Black hair as beautiful. Instead they described it as "closer to sheep wool than human hair."[13] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

34.    In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, even if they were free.[14]

35.    "By requiring free Black women to wear the same hair covering, the governor was marking them as related to enslaved women rather than white women."[15]

36.    This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

37.    Because afro-textured hair was kinky and reflected African heritage rather than European ancestry, afro-textured hair was a symbol of low social status.[16]

38.    Slaves with lighter skin and less coily hair were favored to work in the home, a far less strenuous position than in the plantation fields.[17]

39.    Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery. "Eurocentric beauty standards dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter haired

---

[12] *Id*.
[13] *Ayana Byrd & Lori Tharps*, When Black Hair Is Against the Rules, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-therules.
[14] *Nikki Fox*, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22, 2021, https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts.
[15] Fashionable Rebellion, Women and the American Story, New York Historical Society Museum and Library, https://wams.nyhistory.org/settler-colonialism-and-revolution/settlercolonialism/fashionable-rebellion/.
[16] *Brenda A. Randle*, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114– 121 (2015).
[17] *Id*.

slaves were favored and selected for more desirable positions in the house" as opposed to the fields.[18] Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[19] Naturally, Black men and women strived for a better life in the Americas and were taught that the straighter and less kinky their hair was, the better a life they could have. This fueled the desire for tools and products that could straighten Black hair texture.

40.    Gone were the days of African hairstyles and pride. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[20]

41.    In an effort to obtain a better life, so many slaves would go to "dangerous lengths to straighten their hair."[21]

42.    Black, or afro-textured hair texture, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[22]

43.    The hot comb was first invented by Frenchman, Marcel Grateau who popularized the hair styling tool in Europe in the 1870s, including advertisements in catalogs of major department stores like Sears and Bloomingdales.[23] The hot comb was later modified by Madam C.J. Walker,

---

[18] *Id.*
[19] *Id.*
[20] *Brenda A. Randle*, I Am Not My Hair, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[21] *Nikki Fox*, 6 Things Everyone Should Know About Black Hair History, Odele, Feb., 22,2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts
[22] *Jaclyn Peterson*, The Price of Beauty, CTI Charlotte Teachers Institute Curriculum (2021
[23] *Henry Louis Gates*, Madam Walker, the First Black American Woman to Be a Self-Made Millionaire, PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/africanamericans-many-rivers-to-cross/history/100-

a trailblazer in the development of black hair products, to be manufactured with wider comb teeth.[24] With Walker's system, once the comb was heated a softening ointment was then applied for easier manipulation of black hair.[25]

44.     Today, afro-textured hair is still often straightened with a hot comb rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration,[26] creating a shorter or fuller appearance.

### c.     The Invention of the Chemical Relaxer

45.     African American inventor Garrett Augustus Morgan, discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

46.     In additional to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly.[27] He applied a chemical solution to the needles and wiped the solution off with a rag and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[28]

47.     Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.

---

amazing-facts/madam-walker-the-first-blackamerican-woman-to-be-a-self-made-millionaire/    (last visited October 18, 2022).
[24] *Cookie Lommel*, Madam C.J. Walker 60 (1993)
[25] *Id.* at 62.
[26] *Id.*
[27] *Patrick Obukowcho*, Hair Relaxers: Science, Design, and Application 27 (2018).
[28] *Cookie Lommel*, Madam C.J. Walker – Entrepreneur, Holloway House Publishing  (1993).

48.     Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical based permanent hair straightening products in the Black hair care market.[29]

### d.    Defendants' Marketing Efforts

49.     In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers[30].

50.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[31] As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[32]

51.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[33]

52.     Today, Defendants market their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendant's marketing scheme relies heavily relying on branding and slogans that reinforce straight hair as the standard.[34]

53.     Defendant L'Oréal depicts a Black woman with straight hair on each of its Dark and Lovely and Optimum brands of relaxer product.

---

[29] *Patrick Obukowcho*, Hair Relaxers: Science, Design, and Application 27 (2018).
[30] *Cicely A. Richard*, This History of Hair Relaxers, September 29, 2017 https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.
[31] *Id*.
[32] *Id*.
[33] *Id*.
[34] *Id*.

###### e.    Chemical Relaxer Use

54.    Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

55.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

56.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

57.    Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of ''lye'' relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and ''thio'' relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

58.    In some studies, up to 90% of black and brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Hair products

such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[35]

59.    In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[36] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

60.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

### B.    Regulatory Framework

61.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

62.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

---

[35] *Patrick Obukowcho*, Hair Relaxers: Science, Design, and Application 27 (2018).
[36] *Dana Oliver*, The '90s Just For Me Hair Relaxer Commercaisl Song Is Stuck In Our Heads, HuffPost, Feb., 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercialsong_n_4689981

63.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

64.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user and 2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

65.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

66.     Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[37]

67.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[38] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[39]

68.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry.[40] The FDA revoked authorizations for the food contact use of

---

[37] Food and Drug Administration Cosmetic Act § 602 (1938).
[38] Prohibited & Restricted Ingredients in Cosmetics, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredientscosmetics
[39] 21 Code of Federal Regulations § 700.19
[40] § 87 FR 31080

23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[41]

69.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

70.    The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[42]

71.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[43]

72.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product shall bear a warning statement whenever

---

[41] Phthalates in Food Packages and Food Contact Applications, U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications.
[42] FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA Regulated, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated
[43] *Id*

necessary or appropriate to prevent a health hazard that may be associated with the product."
(Emphasis added). This warning directive directly correlates with the broad authority of
manufacturers over their own cosmetic products to ensure that products are safe under labeled or
customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws

73.    In short, under the current regulatory framework in the United States, it is incumbent upon
the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their
products, and to warn consumers anytime a health hazard may be associated with their products.
Here, a wealth of scientific information is available regarding long-term use of hair relaxers,
straighteners and hair dyes as containing certain endocrine disrupting chemicals, which should
have alerted manufacturers of these products to the specific and dangerous harms associated with
their products when used as intended, particularly in women of color.

### C.    Endocrine-Disrupting Chemicals

74.    The endocrine system is indispensable for life and influences nearly every cell, organ, and
processes within the body.[44] The endocrine system regulates all biological processes in the body
from conception through adulthood, including the development of the brain and nervous system,
the growth and function of the reproductive system, as well as the metabolism and blood sugar
levels.[45]

75.    The endocrine system is a tightly regulated system made up of glands that produce and
release precise amounts of hormones that bind to receptors located on specific target cells
throughout the body.[46]

---

[44] Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system
[45] Endocrine Disruption, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system.
[46] *Id*.

76.     Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[47]

77.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[48]

78.      The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[49]

79.     Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

80.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[50]

81.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

82.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

---

[47] *Id.*
[48] *Id.*
[49] *Id.; Michele La Merrill, et al.*, Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8
[50] *Evanthia Diamanti-Kandarakis, et al.*, Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

83.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

84.    EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[51]

85.    EDCs are known to cause to numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[52]

86.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with breast cancer, and a woman's lifetime risk of developing the disease increases with greater duration and cumulative exposure.

87.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

88.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive

---

[51] *Luis Daniel Martínez-Razo, et al.,* The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub
[52] Endocrine Disrupting Chemicals (EDCs), Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrinelibrary/edcs.

systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[53]

### a. Phthalates

89.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

90.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

91.    At all relevant times herein, phthalates were used in Defendants' products.

92.    Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[54]

93.    Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[55]

94.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

95.    Phthalates can be found in most products that have contact with plastics during producing, packaging, or delivering. Despite the short half-lives in tissues, chronic exposure to phthalates will

---

[53] *Hee-Su Kim, et al.*, Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/ .
[54] *Olivia Koski & Sheila Hu*, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates
[55] *Yufei Wang & Haifeng Qian*, Phthalates and Their Impacts on Human Health, Healthcare(Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[56]

96.    Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[57]

97.    Defendants' products referenced herein contain phthalates, including Di-2-ethylhexylphthalate.

98.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

99.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, were not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

100.    Since 1999, the Centers for Disease Control ("CDC") have found phthalates in individuals studied for chemical exposure.[58] Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

---

[56] *Id*.
[57] *Id*.
[58] Biomarker Groups, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

### b.    Di-2-ethylhexylphthalate

101.    Di-2-ethylhexylphthalate[59] ("DEHP") is a highly toxic manufactured chemical[60] that is not found naturally in the environment.[61]

102.    DEHP belongs to the family of chemicals called phthalates.[62]

103.    DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[63]

104.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[64]

105.    Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[65]

106.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 μg/kg/day.[66]

---

[59] Also known as Bis(2-ethylhexyl) phthalate

[60] *Sai Rowdhwal & Jiaxiang Chen*, Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview, Biomed Research International, Feb., 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to, and%20plastic%20waste%20disposal%20sites.

[61] Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP), U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[62] Di(2-ethylhexyl) phthalate (DEHP), Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[63] *Pinar Erkekoglu & Belma Kocer-Gumusel,* Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[64] *Katelyn H. Wong & Timur Durrani*, Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822.

[65] *Schmidt, Juliane-Susanne, et al.*, Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[66] *Hannon, Patrick et. al.*, Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

107.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerated daily intake (TDI) is 48 μg/kg bodyweight.[67]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 μg/day | N.C. | 410 μg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[68]

108.    When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl) phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl) phthlate (MEOHP).[69]

110.    DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to: endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[70] various cancers, and metabolic syndrome within the human population and their future children.[71]

---

[67] *Yufei Wang & Haifeng Qian*, Phthalates and Their Impacts on Human Health, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[68] *Aalekhya Reddam & David Volz*, Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

[69] *Saab, Yolande, et. al.*, Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/ ; *Ishtaf Sheikh, et. at*., Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4. (Other secondary metabolites include mono (2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

[70] *Richardson, Kadeem et. al.*, Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice, Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[71] *Yufei Wang & Haifeng Qian*, Phthalates and Their Impacts on Human Health, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

111.    Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[72]

112.    The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

a)    **Reproductive effects**. Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b)    **Developmental effects**. Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

113.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[73]

114.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[74]

---

[72] Chapter 2: Health Effects, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.
[73] *Id.*
[74] *Id.*

115.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[75]

116.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[76]

117.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[77]

> ### D.    Injuries Associated with Exposure to Endocrine Disrupting Chemicals

> ### a.    Uterine Cancer

118.    Uterine cancer is associated with phthalate metabolites found in hair care products.

119.    Uterine cancer[78] is among the more common (the fourth most common) cancers in women in developed countries,[79] accounting for about 3% of all new cancer cases.[80]

120.    Every year around 65,000 females develop uterine cancer in the USA alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the mean age being 61 years.[81]

---

[75] *N.M. Grindler, et al*., Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w
[76] *Id*.
[77] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf
[78] Otherwise known as endometrial carcinoma
[79] *Unaiza Faizan & Vijayadershan Muppidi*, Uterine Cancer, In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313/
[80] Cancer Stat Facts: Uterine Cancer, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html
[81] *Id*.

121.    The incidence of uterine cancer in Black women is twice that of White women.[82] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[83]

122.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[84]

123.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same time frame.[85]

133.    A groundbreaking study recently found that women who use chemical hair straightening or relaxing products have a higher risk contracting of uterine cancer.[86]

124.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%[87].

125.    These risk are more substantial among Black women, who make up the overwhelming majority of hair straightening and hair relaxing products, including as Defendants' products.

---

[82] *Id.*

[83] *Joel Sorosky*, Endometrial Cancer, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/

[84] *Linda Duska, et al.*, Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care, American Society Clinical Oncology Educational Book,

[85] *Jack J. Lee*, Rising Endometrial Cancer Rate Spur New Approaches to Prevention, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer

[86] *Che-Jung Chang, et al.*, Use of Straighteners and Other Hair Products and Incident Uterine Cancer, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/

[87] *Id.*

### b. Ovarian Cancer

126. It is estimated that 19,880 women in the United States will be diagnosed with ovarian cancer in 2022, with an estimated 12,810 of those diagnoses resulting in death.[88]

127. Ovarian cancer ranks fifth in cancer deaths amongst women, resulting in more deaths than any other cancer of the female reproductive system.[89]

128. Ovarian cancer is hypothesized to have a hormonally driven etiology, meaning that the insertion of hormonal disrupting compounds and the subsequent disruption of a woman's hormonal balance could lead to ovarian cancer.[90]

129. Products that are used to straighten or relax hair texture have been found to contain an array of endocrine disrupting compounds including, but not limited to, phthalates, parabens, cyclosiloxanes, and metals, in addition to formaldehyde.[91]

130. Recent studies have supported an association between personal hair care products, including products that contain endocrine disrupting compounds, and ovarian cancer.[92]

131. Widely used chemical hair products, such as hair relaxers and straighteners, are a source of exposure to carcinogens and these endocrine disrupters alike.[93]

132. Chemical hair straighteners and relaxers are predominately used by Black and Brown women, who make up the overwhelming majority of consumers of these products: recent scientific

---

[88] Cancer Stat Facts: Ovarian Cancer, National Cancer Institute, https://seer.cancer.gov/statfacts/html/ovary.html
Case: 1:23-cv-00177 Document #: 1 Filed: 01/12/23
[89] Key Statistics for Ovarian Cancer, American Cancer Society, https://www.cancer.org/cancer/ovarian-cancer/about/key-statistics.html#:~:text=Ovarian%20cancer%20ranks%20fifth%20in,is%20about%201%20in%20108.
[90] *White, Alexandra J., et al.,* Use of Hair Products in Relation to Ovarian Cancer Risk, Carcinogeneisi Vol. 42, No. 9, 1189-1195, 1189 (2021).
[91] *Id.*
[92] *Id.*
[93] *Id.*

studies have observed a 15-20% higher risk of ovarian cancer associated with using permanent hair dye more than 100 times.[94]

133.    Other studies have found a positive correlation between the use of straighteners and incidents of ovarian cancer. Self-reported frequent use of hair straighteners has been associated with a higher risk of ovarian cancer.

134.    The risk of ovarian cancer, posed by the use and distribution of these chemical hair relaxers and straighteners, is far more substantial to the overwhelming majority of consumers of these products, African American women.

<strong>c.    Uterine Fibroids</strong>

135.    Uterine fibroids are associated with phthalate metabolites found in hair care products.

136.    Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[95]

137.    A 2017 Rutgers University study linked breast cancer and Black women's use of hair relaxers. A 2012 study in the American Journal of Epidemiology associated fibroid risk with the use of hair relaxers. Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as fibroids (non-cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp."

138.    More recently, the National Institutes of Health spent eight-years studying over 46,000 women of all races between the ages of 35–74. They were looking for links between chemical hair

---

[94] *Id.*
[95] *Id.*

relaxers and breast cancer. And, they discovered African American women's breast cancer risk increased risk by 45%. Breast cancer and other reproductive issues, including, fibroid development, are often connected. So this study suggests there are even more reasons to steer clear of black hair relaxers. Plus, there's a new study from the American Journal of Epidemiology further confirms this link. In their group of 23,000 menstruating Black American women, these participants displayed two to three times higher uterine fibroid incidences.

139.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a correlation between chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[96]

140.    Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

### d.    Endometriosis

141.    Endometriosis is associated with phthalate metabolites found in hair care products.

---

[96] *Nadine White*, Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/homenews/black-hair-lye-no-more-lyes b1893747.html

142.    In Black women in the USA, endometriosis is one of the common indications for major gynecological surgery and hysterectomy, and is associated with long hospital stay and high hospital charges.[97]

143.    Phthalate metabolites were related to increased uterine volume, a sign of fibroids on ultrasound, 2018.[98] The sum of DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%.[99]

144.    The function of the uterine lining, the endometrium, is based on cell–cell interactions under the instruction of steroid hormones.[100] Endometriosis, a common cause of female infertility, occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced cellular equilibrium.[101]

145.    It is estimated that 20% to 50% of women being treated for infertility have endometriosis.[102]

146.    Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[103]

---

[97] *M. C. Kyama*, The prevalence of endometriosis among African-American and Africanindigenous women. Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452/.

[98] *Amir R. Zota et al.,* Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study, Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

[99] *Id*.

[100] *L. Cobellis et al.,* High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis, Human Reproduction, Vol. 18, Issue 7 (2003), 1512–1515, https://doi.org/10.1093/humrep/deg254

[101] *D. L. Olive and L. B. Schwartz, Endometriosis,* The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K. G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to development of endometriosis?*, Seminars in Reproductive Endocrinology, Vol. 15(3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/9383839/.

[102] *Endometriosis*, World Health Organization (March 31, 2021), https://www.who.int/news-room/fact-sheets/detail/endometriosis.

[103] *Id*.

147.    During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptor α,[104] induces growth of the endometrium. [105]

148.    The developing fetus and the female reproductive tract are particularly susceptible to EDCs.[106] EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling.[107] Specifically, DEHP is known to cause enhanced-estrogenic activity. [108]

149.    DEHP is a known estrogen receptor agonist that promotes cell proliferation.[109] An agonist is a chemical that activates a receptor to produce a biological response.

150.    Numerous studies, spanning over decades, establish that DEHP leads to the development of endometriosis as it is known to increase the viability, activity, proliferation, migration of endometrial stromal cells, a required precondition of endometriosis.[110]

---

[104] *Ilaria Paterni et al.*, *Estrogen receptors alpha (ERα) and beta (ERβ): subtype-selective ligands and clinical potential*, Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/.

[105] *Kun Yu et al.*, *Estrogen Receptor Function: Impact on the Human Endometrium*, Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35295981/.

[106] *Saniya Rattan et al.*, *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice*, Toxicol Sci., Vol. 163(2) (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5974785/.

[107] *Xueping Chen et al., Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures*, Int'l J. Envtl. Res. and Pub. Health, 1(3):3156-3168 (2014) https://doi.org/10.3390/ijerph110303156; Pablo A, Pérez et al., *The phthalate DEHP modulates the estrogen receptors α and β increasing lactotroph cell population in female pituitary glands*, Chemosphere, Vol. 258:127304 (2020), https://pubmed.ncbi.nlm.nih.gov/32559490/.

[108] *Chon-Kit Chou et al.*, *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes*, Envtl. Toxicology, Vol. 3, Issue 4 (2019), https://doi.org/10.1002/tox.22694.

[109] *Juhye Kim, et al.*, Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus, Development & reproduction, Vol. 22(4):379-391 (2018), https://pubmed.ncbi.nlm.nih.gov/30680337/. ("In the present study, we could see that in vitro treatment with DEHP caused various biological changes of endometrial cells such as increased MMP-2 and -9 activities, increased cell invasion, increased Erk phosphorylation, and increased Pak4 expression. Taken these findings together with our previous in vitro study, we can propose that refluxed endometrial cells could not only survive in the pelvic cavity following retrograde menstruation, but also invade through mesothelial layer, develop vascular supplies, proliferate at ectopic location, and eventually establish endometriotic lesions through various biological alterations caused by exposure to high level of phthalate.")

[110] *Id*.

151.    Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[111] A study that included a sample size of approximately 500 women living in various states observed that DEHP's metabolite, MEHP, a was the only phthalate consistently associated with endometriosis.[112]

E.    **Ms. LeJeune's Use of Hair Relaxing Products**

152.    Ms. LeJeune was first exposed to the Products containing EDCs and/or phthalate-based products around 1986, around the age of 10, when she began using Defendants' Products, including Dark & Lovely and ORS Olive Oil. Ms. LeJeune purchased the Products she used at numerous retail locations in the State of Louisiana.

153.    Ms. LeJeune used Defendants' Products by applying the Products to her scalp exactly as instructed by Defendants.

154.    Ms. LeJeune continued using Defendants' Products from around 1986 until 2022.

155.    Ms. LeJeune would keep the Product on her hair for the time allotted in the instructions.

156.    There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her injuries, including but not limited to the development of ovarian cancer or any other maladies.

157.    Ms. LeJeune was diagnosed with ovarian cancer in April of 2021 at age 45.

158.    Ms. LeJeune went through a total hysterectomy around May of 2021 at Woman's Hospital in Baton Rouge, Louisiana as well as a course of chemo-therapy treatments at that same facility.

---

[111] *L. Cobellis et. al*, High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis, Human Reproduction, Vol. 18, Issue 7 (July 1, 2013), 1512–1515, https://doi.org/10.1093/humrep/deg254. Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and /or its metabolite, MEHP

[112] *Buck Louis G. M. et al*., Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study, Fertility and sterility, Vol. 100(1):162-9.e1-2 (2013), https://pubmed.ncbi.nlm.nih.gov/23579005/.

159.    Following this procedure, Ms. LeJeune underwent mandatory appointments every six months.

160.    Ms. LeJeune follow-up appointments continue to this day.

161.    As a result of Defendants' acts and/or omissions, Ms. LeJeune lost her ability to have children, suffered extreme pain and suffering, and extreme emotional distress.

**<u>COUNT ONE</u>**
**VIOLATION OF LOUISIANA PRODUCTS LIABILITY ACT**
**(FAILURE TO WARN)**

162.    Plaintiff repeats and realleges the allegations in Paragraphs 1-161 above, as if fully set forth herein.

163.    At all pertinent times, the Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business. Defendants exercised control over and/or influenced a character of the design, manufacturing and/or quality of the Products.

164.    At all pertinent times, Plaintiff used the Products on her scalp area, which is a reasonably foreseeable use.

165.     At all pertinent times, Defendants in this action knew or should have known that the use of products containing phthalates and other EDC's significantly increases the risk of cancer, including, but not limited to, ovarian cancer, based upon scientific knowledge.

166.    At all pertinent times, including the time of sale and consumption, the Products, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of cancer, including, but not limited to ovarian cancer, associated with the use of the Defendant's hair products. Defendants themselves failed

to properly and adequately warn and instruct Plaintiff as to the risks and benefits of the Products given her need for this information.

167.    Had Plaintiff received a warning that the use of the Products would significantly increase her risk of developing cancer, she would not have used them. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the Products, Plaintiff was injured catastrophically, and was caused severe pain, suffering, infertility, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

168.    The development of cancer by Plaintiff was the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Plaintiff suffered injuries and damages including, but not limited to, physical and mental pain and suffering, infertility and medical expenses.

169.    Defendants' products were defective because they failed to contain warnings and/or instructions and breached express warranties and/or failed to conform to express factual representations upon which Plaintiff justifiably relied in electing to use the Products. The defect or defects made the Products unreasonably dangerous to persons, such as Plaintiff, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of Plaintiff's injuries and damages.

170.    Defendants' products failed to contain, and continue to this day not to contain, adequate warnings and/or instructions regarding the increased risk of cancer, including, but not limited to, ovarian cancer, with the use of their products by women. Defendants continue

to market, advertise, and expressly represent to the general public that it is safe for women to use their product.

171.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

      a.    Economic losses including medical care, lost earnings and loss of earning capacity; and

      b.    Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

### COUNT TWO
### VIOLATION OF THE LOUISIANA PRODUCTS LIABILITY ACT
### (DESIGN AND/OR MANUFACTURING DEFECT)

172.    Plaintiff repeats and realleges the allegations in Paragraphs 1-161 above, as if fully set forth herein.

173.    Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

174.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

175.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

176.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

177.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing ovarian cancer.

178.    The propensity of phthalates and other endocrine disruptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, in the ovaries, thereby substantially increasing the risk of cancer, including, but not limited to, ovarian cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

179.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, are readily available.

180.    Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

181.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

182.    Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because the Products were unreasonably dangerous in that they increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus and endometrium, thereby substantially increasing the risk of cancer, including, but not limited to, ovarian cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

183.    Defendants also breached their duty by failing to use reasonable care by failing to use

cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of

their Products.  Additionally, the likelihood that the Products' design would cause Plaintiff's

damage and the gravity of the damage greatly outweighed the burden on the Defendants of

adopting such alternative design and the adverse effect, if any, of such alterative design on the

utility of the Products.

184.    A reasonable company under the same or similar circumstances would have designed

a safer product.

185.    As a direct and proximate result of Defendants' conduct, including actions, omissions,

and misrepresentations, Plaintiff sustained the following damages:

   a.    Economic losses including medical care, lost earnings and loss of earning

           capacity; and

   b.    Noneconomic losses including physical and mental pain and suffering, infertility,

           emotional distress, inconvenience, loss of enjoyment and impairment of quality of

           life, past and future.

## COUNT THREE
## BREACH OF EXPRESS WARRANTY
## UNDER LOUISIANA PRODUCTS LIABILITY ACT

186.    Plaintiff repeats and realleges the allegations in Paragraphs 1-161 above, as if fully set

forth herein.

187.    The Defendants expressly warranted, through direct- to-consumer marketing,

advertisements, and labels, that the Products were safe and effective for reasonably

anticipated users.

36

188.    The Products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants in the form of cancer, including, but not limited to, ovarian cancer.

189.    Plaintiff was induced by Defendants to use the Product and the Plaintiff's damages were proximately caused because the express warranty was untrue.

190.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a.    Economic losses including medical care, lost earnings and loss of earning capacity; and

    b.    Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## JURY DEMAND

191.    Plaintiff demands a trial by jury

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and causes of action, and as follows:

1.    Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, loss of earning capacity and other economic damages in an amount to be determined at trial of this action;

3.    Prejudgment interest;

4.    Post judgment interest;

5.    Awarding Plaintiff's reasonable attorneys' fees;

6.    Awarding Plaintiff the costs of these proceedings; and

7.    Such other and further relief as this Court deems just and proper.

Respectfully submitted,

_/s/ Thomas M. Beh_
STEPHEN B. MURRAY (#9858)
STEPHEN B. MURRAY, Jr. (#23877)
THOMAS M. BEH (# 24018)
THE MURRAY LAW FIRM
701 Poydras Street, Suite 4250
New Orleans, LA 7019
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
E-Mail: tbeh@murray-lawfirm.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I have served the foregoing pleading on all counsel of record in this matter via the Court's ECF system, email, facsimile and/or United States Postal Service, First Class Mail, postage prepaid and properly addressed on this 28th day of February, 2023.

_/s/ Thomas M. Beh_